UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SHAWN ANDERSON,<br><br>Plaintiff,<br><br>v.<br><br>CHRIS KRPAN, *et al.*,<br><br>Defendants. | Case No. 1:14-cv-01380-AWI-JDP<br><br>FINDINGS AND RECOMMENDATIONS THAT DEFENDANT'S MOTION FOR SUMMARY JUDGMENT BE GRANTED<br><br>ECF No. 58<br><br>OBJECTIONS, IF ANY, DUE WITHIN FOURTEEN DAYS |

## I.    INTRODUCTION

Plaintiff is a state prisoner proceeding without counsel in this civil rights action brought under 42 U.S.C. § 1983.  ECF No. 16.  This action now proceeds on the first amended complaint, filed on February 2, 2015, against defendants Chris Krpan and Michael Forster, physicians who treated plaintiff.  *Id.*; ECF No. 30.  Plaintiff alleges deliberate indifference to his serious medical needs in violation of the Eighth Amendment.  ECF No. 16 at 9.

On March 7, 2018, defendant Krpan filed a motion for summary judgment.  ECF No. 58.[1] Plaintiff filed an opposition on May 11, 2018, ECF No. 63, and defendant filed a reply on May

---

[1] Concurrently with his motion for summary judgment, defendant served plaintiff with the requisite notice of the requirements for opposing the motion.  *See Woods v. Carey*, 684 F.3d 934, 939-41 (9th Cir. 2012); *Rand v. Rowland*, 154 F.3d 952, 960-61 (9th Cir. 1998).

1

21, 2018, ECF No. 70.  The motion was submitted on the record without oral argument under Local Rule 230(*l*).  Defendant's motion for summary judgment is now before the court.

Upon reviewing the filings, we find that the evidence shows that defendant Krpan affirmatively treated plaintiff's medical need.  Accordingly, defendant has negated an essential element of plaintiff's deliberate indifference claim, and we will recommend granting defendant's motion for summary judgment.  We will also give plaintiff notice that, under Federal Rule of Civil Procedure 56(f), the court will consider summary judgment for defendant on plaintiff's claim against defendant Forster.

## II.    LEGAL STANDARDS

### a.  Summary Judgment

Summary judgment is appropriate where there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *Washington Mutual Inc. v. United States*, 636 F.3d 1207, 1216 (9th Cir. 2011).  An issue of fact is genuine only if there is sufficient evidence for a reasonable fact finder to find for the non-moving party, while a fact is material if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Wool v. Tandem Computers, Inc.*, 818 F.2d 1422, 1436 (9th Cir. 1987).

Rule 56 allows a court to grant summary adjudication, also known as partial summary judgment, when there is no genuine issue of material fact as to a claim or portion of that claim. *See* Fed. R. Civ. P. 56(a); *Lies v. Farrell Lines, Inc.*, 641 F.2d 765, 769 n.3 (9th Cir. 1981) ("Rule 56 authorizes a summary adjudication that will often fall short of a final determination, even of a single claim . . . .") (internal quotation marks and citation omitted).  The standards that apply on a motion for summary judgment and a motion for summary adjudication are the same.  *See* Fed. R. Civ. P. 56 (a), (c); *Mora v. Chem-Tronics*, 16 F. Supp. 2d 1192, 1200 (S.D. Cal. 1998).

Each party's position must be supported by (1) citing to particular portions of materials in the record, including but not limited to depositions, documents, declarations, or discovery; or (2) showing that the materials cited do not establish the presence or absence of a genuine dispute or that the opposing party cannot produce admissible evidence to support the fact.  *See* Fed. R.

Civ. P. 56(c)(1) (quotation marks omitted). The court may consider other materials in the record not cited to by the parties, but it is not required to do so. *See* Fed. R. Civ. P. 56(c)(3); *Carmen v. San Francisco Unified School Dist.*, 237 F.3d 1026, 1031 (9th Cir. 2001); *see also Simmons v. Navajo County, Ariz.*, 609 F.3d 1011, 1017 (9th Cir. 2010).

"The moving party initially bears the burden of proving the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). To meet its burden, "the moving party must either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos., Inc.*, 210 F.3d 1099, 1102 (9th Cir. 2000). If the moving party meets this initial burden, the burden then shifts to the non-moving party "to designate specific facts demonstrating the existence of genuine issues for trial." *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 387 (citing *Celotex Corp.,* 477 U.S. at 323). The non-moving party must "show more than the mere existence of a scintilla of evidence." *Id.* (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)). However, the non-moving party is not required to establish a material issue of fact conclusively in its favor; it is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *T.W. Electrical Serv., Inc. v. Pacific Elec. Contractors Assoc.*, 809 F.2d 626, 630 (9th Cir. 1987).

The court must apply standards consistent with Rule 56 to determine whether the moving party has demonstrated there to be no genuine issue of material fact and that judgment is appropriate as a matter of law. *See Henry v. Gill Indus., Inc.*, 983 F.2d 943, 950 (9th Cir. 1993). "[A] court ruling on a motion for summary judgment may not engage in credibility determinations or the weighing of evidence." *Manley v. Rowley,* 847 F.3d 705, 711 (9th Cir. 2017) (citation omitted). The evidence must be viewed "in the light most favorable to the nonmoving party" and "all justifiable inferences" must be drawn in favor of the nonmoving party. *Orr v. Bank of America, NT & SA*, 285 F.3d 764, 772 (9th Cir. 2002); *Addisu v. Fred Meyer, Inc.*, 198 F.3d 1130, 1134 (9th Cir. 2000).

### b. Deliberate Indifference to Serious Medical Needs

"[T]o maintain an Eighth Amendment claim based on prison medical treatment, an inmate must show 'deliberate indifference to serious medical needs.'" *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006) (quoting *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)). The two-part test for deliberate indifference requires the plaintiff to show (1) "'a serious medical need' by demonstrating that 'failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain,'" and (2) that "the defendant's response to the need was deliberately indifferent." *Jett*, 439 F.3d at 1096 (quoting *McGuckin v. Smith*, 974 F.2d 1050, 1059 (9th Cir. 1992), *overruled on other grounds by WMX Techs., Inc. v. Miller*, 104 F.3d 1133, 1136 (9th Cir. 1997) (en banc) (internal quotations omitted)). "This second prong— defendant's response to the need was deliberately indifferent—is satisfied by showing (a) a purposeful act or failure to respond to a prisoner's pain or possible medical need and (b) harm caused by the indifference." *Id.* (citing *McGuckin*, 974 F.2d at 1060). Indifference may be manifest "when prison officials deny, delay or intentionally interfere with medical treatment, or it may be shown by the way in which prison physicians provide medical care." *Id.* When a prisoner alleges a delay in receiving medical treatment, the delay must have led to further harm for the prisoner to make a claim of deliberate indifference to serious medical needs. *See McGuckin*, 974 F.2d at 1060 (citing *Shapely v. Nevada Bd. of State Prison Comm'rs*, 766 F.2d 404, 407 (9th Cir. 1985)).

"Deliberate indifference is a high legal standard." *Toguchi v. Chung*, 391 F.3d 1051, 1060 (9th Cir. 2004). "Under this standard, the prison official must not only 'be aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists,' but that person 'must also draw the inference.'" *Id.* at 1057 (quoting *Farmer*, 511 U.S. at 837). "If a prison official should have been aware of the risk, but was not, then the official has not violated the Eighth Amendment, no matter how severe the risk." *Id.* (quoting *Gibson v. County of Washoe*, 290 F.3d 1175, 1188 (9th Cir. 2002)). "A showing of medical malpractice or negligence is insufficient to establish a constitutional deprivation under the Eighth Amendment." *Id.* at 1060. "[E]ven gross negligence is insufficient to establish a constitutional violation." *Id.* (citing *Wood*

4

*v. Housewright*, 900 F.2d 1332, 1334 (9th Cir. 1990)).  Additionally, a difference of opinion between an inmate and prison medical personnel—or between medical professionals—on appropriate medical diagnosis and treatment is not enough to establish a deliberate indifference claim.  *See Toguchi*, 391 F.3d at 1058; *Sanchez v. Vild*, 891 F.2d 240, 242 (9th Cir. 1989).

## III.    SUMMARY JUDGMENT RECORD

To decide a motion for summary judgment, a district court may consider materials listed in Rule 56(c).  Those materials include depositions, documents, electronically-stored information, affidavits or declarations, stipulations, party admissions, interrogatory answers, "or other materials."  Fed. R. Civ. P. 56(c).  A party may object that an opponent's evidence "cannot be presented in a form that would be admissible" at trial, *see* Fed. R. Civ. P. 56(c)(2), and the court ordinarily rules on evidentiary objections before deciding a summary judgment motion to determine what materials the court may consider.  *See Norse v. City of Santa Cruz*, 629 F.3d 966, 973 (9th Cir. 2010); *Fonseca v. Sysco Food Servs. of Arizona, Inc*., 374 F.3d 840, 845 (9th Cir. 2004).  Here, defendant presents plaintiff's first amended complaint, ECF No. 16; the declaration of defendant Christopher Krpan, D.O., ECF No. 58-3; the declaration of Eric Giza, M.D., and accompanying exhibits, ECF No. 58-4, ECF No. 58-5; and the declaration of attorney Robert D. Sanford and accompanying exhibits, ECF No. 58-6, ECF No. 58-7, ECF No. 58-8, ECF No. 58-9, ECF No. 58-10, ECF No. 58-11.  Plaintiff presents his declaration and accompanying exhibits. ECF No. 66.

### A.  Plaintiff's Objections to Giza Declaration

Plaintiff objects to the admissibility of Dr. Eric Giza's declaration.  ECF No. 62.  Plaintiff argues that Giza "does not possess the prerequisite personal knowledge of the facts of this case as he did not personally witness any fact of this action and attempts to assign personal knowledge by vicarious means of reviewing materials presented to him by defendant's lawyers."  ECF No. 62 at 1.  Specifically, plaintiff objects to Giza stating opinions "concerning the state of mind of defendant Krpan which is outside the expert's scientific, technical, or other specialized knowledge."  ECF No. 62 at 1 (citing Fed. Rule of Ev. 702).  Plaintiff also objects to Krpan's "legal interpretations," assessment of plaintiff's pain, "hearsay statements," and "interpretations

5

concerning the Administrative Code." ECF No. 62 at 2-3. In response, defendant contends that "Dr. Giza does not opine as to Dr. Krpan's state of mind or offer legal conclusions" and that the "declaration should be allowed into evidence." ECF No. 70 at 9.

Rule 702 of the Federal Rules of Evidence permits a party to offer testimony by a "witness who is qualified as an expert by knowledge, skill, experience, training, or education." Fed. R. Evid. 702. This Rule embodies a "relaxation of the usual requirement of firsthand knowledge," *Daubert v. Merrel Dow Pharm.*, 509 U.S. 579, 592, (1993), and requires that certain criteria be met before expert testimony is admissible. The Rule sets forth four elements, allowing such testimony only if:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. These criteria can be distilled to two overarching considerations: "reliability and relevance." *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 982 (9th Cir. 2011). The inquiry does not, however, "require a court to admit or exclude evidence based on its persuasiveness." *Id.*

"Where an 'expert report' amounts to written advocacy . . . akin to a supplemental brief, a motion to strike is appropriate because this evidence is not useful . . . ." *Williams v. Lockheed Martin Corp.*, No. 09CV1669 WQH (POR), 2011 WL 2200631, at *15 (S.D. Cal. June 2, 2011) (citation omitted) (first ellipsis in original). Though "[a]n opinion is not objectionable just because it embraces an ultimate issue," Federal Rule of Ev. 404(a), "an expert witness cannot give an opinion as to her legal conclusion, i.e., an opinion on an ultimate issue of law." *United States v. Diaz*, 876 F.3d 1194, 1197 (9th Cir. 2017). Such an opinion would not "aid the jury in making a decision, but rather attempt[] to substitute the expert's judgment for the jury's." *Id.*; *accord Hangarter v. Provident Life & Acc. Ins. Co.*, 373 F.3d 998, 1016 (9th Cir. 2004). An

expert nevertheless may, in appropriate circumstances, rely on her understanding of the law and refer to the law in expressing an opinion regarding professional norms. *Hangarter*, 373 F.3d at 1016-17.

Considering these standards, certain of plaintiff's objections to Eric Giza's declaration—such as Giza's lack of personal knowledge—are frivolous. However, plaintiff was right to object to Giza's opinions on matters outside the scope of his expertise, such as whether defendant's conduct amounted to a constitutional violation:

> Dr. Krpan's Medical Treatment of Mr. Anderson Did Not Constitute Deliberate Indifference to Mr. Anderson's Medical Condition but Was Well Within the Standard of Care for Orthopedists
> . . .
> I understand a violation of the Eighth Amendment requires that Mr. Anderson prove that Dr. Krpan inflicted unnecessary and wanton pain on Mr. Anderson by acting with deliberate indifference to Mr. Anderson's injured right ankle, thereby inflicting unnecessary and wanton pain on Mr. Anderson. Pursuant to my review, there is no evidence that Dr. Krpan acted with deliberate indifference toward Mr. Anderson by knowingly and deliberately ignoring an excessive risk of harm to Mr. Anderson. There is also no evidence that Dr. Krpan caused Mr. Anderson to suffer the unnecessary and wanton pain by failing to treat a serious medical need.

ECF No. 58-4 at 3. Statements such as these are approaching improper "opinion[s] on an ultimate issue of law," *Diaz*, 876 F.3d at 1197, and will not be considered by the court.

## B. Defendant's Objections to Anderson Declaration

Defendant raises numerous objections to statements in Anderson's declaration. ECF No. 71. Many of these objections are immaterial to the court's ruling, and the court will therefore decline to address them. *See Norse*, 629 F.3d at 973. The court will, however, address defendant's sole material objection.

Defendant objects to plaintiff's assertions regarding matters within defendants' personal knowledge. *See, e.g.*, ECF No. 71 ¶¶ 17, 21. For example, plaintiff opines that "Dr. Forster was aware that I suffered an urgent medical condition" and that "Dr. Krpan was personally aware that . . . bone particles must be removed through surgery." ECF No. 71 ¶¶ 34, 39. Defendant

7

argues that these opinions are improper because plaintiff lacks personal knowledge to give them.  ECF No. 71 ¶¶ 15, 16.

This objection is well taken.  Plaintiff is not qualified to say what the doctors were personally aware of because be lacks personal knowledge of the matters.  *See* Fed. R. Evid. 602 ("A witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter.").  Accordingly, the court will not credit such assertions.

### C.  The Factual Record

In accordance with Local Rule 260, defendants filed a statement of undisputed facts, ECF No. 58-2, and plaintiff filed a reproduction of that statement with admissions and denials as appropriate, ECF No. 64.  The court has reproduced the facts below, calling attention to material disputes.

### i.  The Parties

Mr. Anderson is a state prisoner who, at the time he initiated this pro per action, was incarcerated at Sierra Conservation Camp ("SCC"), a facility of the California Department of Corrections and Rehabilitation ("CDCR") located in Jamestown, California.  Declaration of Robert D. Sanford ("Sanford Decl.") ¶ 1, Ex. A; FAC ¶¶ 1, 3; Declaration of Shawn Anderson ("Anderson Decl.") ¶¶ 1-2.

Dr. Krpan is an osteopathic physician and surgeon licensed by the Osteopathic Medical Board of California.  Declaration of Christopher Krpan, D.O. ("Krpan Decl.") ¶ 2.  At all relevant times, Dr. Krpan was an independent contractor for CDCR, including while providing medical treatment for Mr. Anderson.  *Id.* ¶ 2.  Defendant Michael Forster, M.D., is a physician employed by CDCR.  FAC ¶ 5; Anderson Decl. ¶ 5.

### ii.  Mr. Anderson's Right Ankle Injury and Surgery

Mr. Anderson alleges that in July 2011 he suffered "a severe injury to his right ankle while playing basketball," while he was an inmate at Corcoran State Prison ("CSP").  FAC ¶ 16; *accord* Anderson Decl. ¶ 21.  On or about February 22, 2012, at Mercy Hospital in Bakersfield,

California, Mr. Anderson underwent surgery on his right ankle which consisted of "[a]rthrotomy[2] [and] excision of the bony ossicle lateral aspect of ankle" and "[r]econstruction lateral collateral ligament with modified Evans procedure." Sanford Decl. ¶ 3, Ex. B ("Mercy Records") at Anderson-MHB-00064; FAC ¶ 18; Anderson Decl. ¶ 21. A "modified Evan procedure" involves the attachment of muscle around the ankle to a reconfigured tendon in order to improve the ankle's stability. Giza Decl. ¶ 11. Mr. Anderson's pre-operative diagnosis was '[s]tatus post torn lateral collateral ligament and avulsion fracture of the right ankle" and "[c]hronic instability of the right ankle." Mercy Records at Anderson-MHB-00064; Anderson Decl. ¶ 46. His post-operative diagnosis was the same. Mercy Records at Anderson-MHB-00064; Anderson Decl. ¶ 46.

Mr. Anderson alleges that he continued to suffer severe pain and swelling for months following the surgery and that he experienced an infection at the surgical site that was treated with antibiotics. FAC ¶¶ 19-20; Anderson Decl. ¶¶ 27-28. According to Mr. Anderson, following the surgery, he could not bear weight on his ankle and had to use a wheelchair. FAC ¶ 20; Anderson Decl. ¶ 28. A radiological interpretation of a magnetic resonance imaging ("MRI") dated August 13, 2012 revealed that Mr. Anderson's ligaments and tendons were intact, with "no significant soft tissue swelling evident." Sanford Decl. ¶ 4, Ex. C ("SCC Records") at 281-282. On October 19, 2012, Mr. Anderson was examined by David G. Smith, M.D., an orthopedic surgeon. SCC Records at 374; Anderson Decl. ¶ 73. Dr. Smith's report referred to the MRI of Mr. Anderson's ankle, "which revealed that the repair appeared to be intact and there was no evidence of any rupture of the tendons." SCC Records at 374. Dr. Smith made the following findings:

> On examination, there is soft tissue swelling laterally in the right ankle and there is a well healed surgical scar. Neurovascular status is intact in the right distal lower extremity. There is no instability to inversion stress or to anterior drawer, and the reconstruction appears to be intact.

---

[2] According to defendants, "[a]rthrotomy is the surgical opening of a joint." ECF No. 58-1 at 8.

*Id.*

Dr. Smith concluded that Mr. Anderson "appears to just have some swelling and inflammation related to the surgery itself, and he does not appear to have any infection or rupture of the repair." *Id.* Dr. Smith recommended an ankle-foot orthosis ("AFO")—a brace worn on the lower leg and foot to support the ankle. *Id.*; Anderson Decl. ¶ 73.

Mr. Anderson alleges that he was transferred to SCC from CSP in late 2012. FAC ¶ 21; Anderson Decl. ¶ 29. A Medical Progress Note documents that Dr. Forster examined Mr. Anderson on November 6, 2012, after Mr. Anderson's recent arrival at SCC. SCC Records at 183-84; Anderson Decl. ¶ 30; FAC ¶ 22. Dr. Forster noted that Mr. Anderson had not received the AFO before his transfer to SCC, requested a cane instead of crutches, and wanted "to get the brace and not see an orthopedist unless he feels he may need surgery and does not do well with the brace." SCC Records at 183-84. Dr. Forster also documented that Mr. Anderson had hypertension (high blood pressure) that was treated with medication, so Dr. Forster would see him every five to six months. *Id.* at 184.

Dr. Forster next examined Mr. Anderson on November 27, 2012, at which point the plan was to explore whether Mr. Anderson could transfer back to CSP to be examined by Dr. Smith and be fitted for the AFO brace. SCC Records at 182. If Mr. Anderson could not transfer within 30 days, the plan was for Dr. Forster to examine him again. *Id.* Mr. Anderson did not transfer back to CSP, so Dr. Forster examined Mr. Anderson again on January 10, 2013. Dr. Forster then documented a plan to refer Mr. Anderson to an orthopedist at SCC "to determine the need for an AFO brace or not" and to reexamine Mr. Anderson in 45-60 days. SCC Records at 43-44, 179. On January 10, 2013, Dr. Forster completed a Physician Request for Services (CDCR Form 7243) for "routine" service (as opposed to "emergent" or "urgent") for a specialty consultation by an orthopedist for an AFO evaluation. SCC Record at 370.

### iii. Dr. Krpan's Medical Treatment of Mr. Anderson on February 14, 2013

Following Dr. Forster's referral, Dr. Krpan examined Mr. Anderson on February 14, 2013, and documented the examination in a Medical Consultation dated February 14, 2013.

10

Krpan Decl. ¶ 4; SCC Records at 368-69; Anderson Decl. ¶¶ 36-40.  Dr. Krpan took and documented Mr. Anderson's relevant medical history in detail:

> This is a 30-year-old African American male patient from [SCC] who complains of right ankle pain and some mild chronic instability that was improved after a modified Evan's procedure to the right ankle that was done by Dr. Pike back on 02/22/2012.  He states that he had recurrent ankle instability and recurrent ankle sprains while being a younger man playing sports, mostly basketball but then over a year ago, maybe 18 months ago, he sprained he [sic] ankle severely while playing basketball [and had the surgery] . . . .  He states that he still has some pain in the ankle.  He was in a wheelchair for many months.  He was ordered to get an AFO by a Dr. David Smith in followup while he was in Corcoran but this was never done.  He did have a repeat MRI of the ankle done on 08/13/2012, which showed suture anchor in place, oblique tunnel through the distal aspect of the lateral malleolus, as well as what appeared to be a lateral ankle reconstruction with intact tendon transfer.  He states he has never gotten the ankle support and still has some mild pain and was wondering if there is anything that can be done.

Krpan Decl. ¶ 4(a); SCC Records at 368; Anderson Decl. ¶¶ 36-40.

Dr. Krpan's objective findings upon examining Mr. Anderson included a "benign and well-healed" incision over the ankle, which "had full range of motion."  Krpan Decl. ¶ 4(b); SCC Records at 368.  Dr. Krpan further documented:

> He does not appear to have any instability with varus or valgus stress testing and negative anterior drawer as well.  Neurovascularly he is intact with bounding pulses of both dorsalis pedis and posterior tibialis, and normal sensation. He walks with a can[e] but upon watching him, he has really no antalgic gait or limp appreciated.

Krpan Decl. ¶ 4(b); SCC Records at 368.

Dr. Krpan reviewed an x-ray of Mr. Anderson's ankle taken on the date of the examination, February 14, 2013, and documented:

11

> X-rays done today of the right ankle three views shows some mild
> posttraumatic change with small spurring off the anterior and
> posterior distal tibia, as well as some spurring off the medial
> malleolus, and some bony ossicles around the lateral malleolus,
> bony tunnel of the distal fibular appears to be in good position. The
> ankle mortise is well reconstructed. The tibia/fibula overlap is
> normal. His talocrural angle is normal.

Krpan Decl. ¶ 4(c); SSC Records at 368.

The following facts concerning Dr. Krpan's treatment of Mr. Anderson on February 14, 2013 are in dispute. Defendant makes the following allegations: Based upon Dr. Krpan's professional judgment, he assessed that surgery to remove the ossicles, or bone fragments, was not indicated, since Mr. Anderson had a full range of motion and the risks of a second surgery outweighed any possible benefit. Krpan Decl. ¶ 4(c). Dr. Krpan's professional assessment that a second surgery to address the common phenomenon of small bone fragments was not warranted is within the standard of care. Giza Decl. ¶¶ 8, 13, 21. As a result of his examination, Dr. Krpan assessed that Mr. Anderson's reconstructive ankle surgery "appears to be functioning well," although he still had "[s]ome mild continued ankle pain." SCC Records at 368. Dr. Krpan detailed a plan of treatment:

> I think an ankle stirrup support and/or AFO is completely
> reasonable to try to get [Mr. Anderson] back to some activity. He
> asked when he would be completely normal. I have made it very
> clear I do not think he ever will. He had a severe injury to his ankle
> that required a reconstructive surgery. This may never be
> completely normal and he needs to understand this and he may
> always live with a little bit of pain, as he is starting to develop some
> postinjury/posttramatic arthritis of the ankle. But it does appear
> that his reconstruction has held and he has a stable ankle and this
> should be able to allow him to walk and hopefully work when he is
> released. I told him getting back to basketball is obviously going to
> be risky, as he has had as he describes over 100 ankle sprains and
> then one very severe one that results in the above-mentioned
> surgery. He would be taking the stability of his ankle in his own
> hands and at risk if he pursued any further aggressive type activities
> as he has described. We will see how he does with an ankle support
> and I told him he can try with that trying [sic] to get back to some
> activities as he tolerates.

12

SCC 369; Krpan Decl. ¶ 4(d); *see also* SCC 178 (Specialty Clinic Progress Note, dated 2-14-13, documenting Dr. Krpan's examination and recommendation for a brace, with a follow-up as needed).  Mr. Anderson disputes these facts on the grounds that (1) these are not material facts; (2) the evidence cited does not support them; and (3) the quoted language is not verbatim, but paraphrased.  ECF No. 64 at 8.

A radiological report dated February 19, 2013 of the x-ray taken on February of 14, 2013, to which Dr. Krpan referred in his examination notes, revealed the following findings and impressions:

> FINDINGS:  There are changes of old trauma at both malleoli.
> There is spurring at the medial malleolus and multiple small
> fragments are seen distal to the lateral malleolus.  There is minimal
> ankle arthritis.  There is no evidence of acute fracture or
> dislocation.  There is no evidence of an effusion.  There is soft
> tissue swelling laterally.
> IMPRESSION:  1. Changes of old trauma.  2. Minimal
> osteoarthritis.  3. Lateral soft tissue swelling.

Krpan Decl. ¶ 3; *accord* SCC Records at 280, 368.

On February 26, 2013, Dr. Forster documented that he ordered an "Aircast stirrup splint, XL" for Mr. Anderson.  SCC Records at 41, 177.  On March 6, 2013, Mr. Anderson completed a CDCR Health Care Services Request Form for the following stated reason:

> On 2-27-13 I was provided a aircast ankle brace[.]  [A]fter using the
> brace for more than 20 minutes my ankle and foot started to tingle
> and lose feeling[.]  I need a bigger fit or possible different brace
> although it does provide some support!

SCC Records at 176.

On March 20, 2013, Dr. Forster examined Mr. Anderson and documented:

> Saw RN for his [right] ankle brace being too tight, asked for larger
> size but none available.  Now says actually it is too tight up high
> on lower leg + too loose on ankle (likely due to his size 6' 3" 334

lbs).  Requests a smaller size to fit ankle . . . .  Will order size medium (had large).

SCC Records at 40, 163.

On April 20, 2013, Mr. Anderson completed another Health Care Services Request Form that the replacement medium-sized Aircast brace was "too small although somewhat supportful but after waring [sic] it for so long my ankle and foot start to tingle and go numb and my ankle begins to throb with pain very bad."  SCC Records at 174.  Dr. Forster examined Mr. Anderson on May 3, 2013 and documented: "[right] ankle – large [with] large calf which apparently makes it hard to wear the splint," so Dr. Forster requested a follow-up appointment with Dr. Krpan because Mr. Anderson was "[n]ot improving with recommended splint."  SCC Records at 39, 173.

### iv.  Dr. Krpan's Medical Treatment of Mr. Anderson on May 9, 2013

Dr. Krpan examined Mr. Anderson a second time on May 9, 2013.  Krpan Decl. ¶ 5; SCC Records at 364-66.  As part of Mr. Anderson's medical history, Dr. Krpan documented that Mr. Anderson reported that "he really has not had any episodes of instability," but that the Aircast brace "did not fit well and did not help," so "[h]e was hoping to try a different type of ankle brace."  Krpan Decl. ¶ 5(a); SCC Records at 365.  Dr. Krpan's objective findings included that Mr. Anderson walked "with what appears to be a non-antalgic gait" and had "a full range of motion, although [he did] seem apprehensive while doing this, on examination."  Krpan Decl. ¶ 5(b); SCC Records at 365.  Dr. Krpan assessed that Mr. Anderson "seems to be functioning well" after his surgery, but had "[s]ome mild chronic ankle pain, either anterolateral capsulitis and/or potential postraumatic arthritis developing."  Krpan Decl. ¶ 5(c); SCC Records at 365.  During the May 9, 2013 examination, Dr. Krpan documented the following plan of treatment:

I did agree to try a lace-up ankle support that we do have available here at the prison.  We will see if this works before we go to some type of custom device.  I did discuss with him that a custom AFO is going to be quite constricting, and I do not think at his age, or what he is trying to do with his activity level, is going to be helpful to

him, but we will see if this lace-up one works. I did discuss with
him against modified activities, and discussed with him that I know
this is difficult for him to accept, but at his young age and with him
getting out of prison here in the next five years or so and still being
a young man, he does need to start thinking about that this ankle
needs to support him through the remainder of his life for working
and most likely not for basketball. He states he understands and
this is starting to sink in.

SCC Records at 365; *accord* Krpan Decl. ¶ 5(d).

Following the May 9, 2013 examination, Dr. Krpan completed and signed a CDCR Form 7243 recommending that Mr. Anderson receive a lace-up ankle support with a follow-up examination as needed. Krpan Decl. ¶ 5(e); SCC Records at 364.

On May 21, 2013, Dr. Forster noted that Mr. Anderson received a neoprene ankle sleeve instead of the lace-up brace prescribed by Dr. Krpan, so the sleeve would be replaced by the brace. SCC Records at 171. On July 30, 2013, Dr. Forster documented that Mr. Anderson "has [a] lace-up brace which has helped him a lot. Doing ok. Taking morphine ER + the dose is just right." *Id.* at 170. By September 10, 2013, Mr. Anderson's ankle pain had increased and his range of motion decreased, so he was referred to his physician for a routine examination. *Id.* at 167. Dr. Forster examined Mr. Anderson on September 30, 2013 and documented that the lace-up ankle brace was too small, so an extra-large size would be ordered. *Id.* at 165. Two days later, on October 2, 2013, Dr. Forster again examined Mr. Anderson and noted that he was "currently using a lace-up ankle brace and he says it is working well. He ambulates with a cane. Does not feel he has to see ortho at this time." *Id.* at 164. On October 15, 2013, Dr. Forster documented that Mr. Anderson's "ankle is doing much better with size CL lace-up ankle brace. He is actually walking laps now, and has lost 7 lbs in 2 weeks." *Id.* at 163. Dr. Forster's examination on November 19, 2013 focused on Mr. Anderson's high blood pressure, not his ankle, and noted Mr. Anderson's weight gain and his statement that he was "eating way too much." *Id.* at 162. An examination by Dr. Forster on February 25, 2014 noted that Mr. Anderson suffers chronic ankle pain, but wears a brace and has a cane, takes morphine and is "at goal." *Id.* at 160.

15

**v.        Mr. Anderson's Administrative Appeal Filed on March 3, 2014**

On March 3, 2014, Mr. Anderson filed an administrative appeal with CDCR, Log # SCC HC 14011287, alleging that he was "under care of M. Forster, MD for broken ankle since 11-2-12, continue to receive inadequate care, ankle brace does not fit, ankle continues to turn. Require custom fit brace, request orthopedic exam, custom support shoes." Sanford Decl. ¶ 5 Ex. D ("CDCR Administrative Records"). Mr. Anderson requested "30 million dollars and all future medical expenses, placement as high risk medical, orthopedic exam." *Id.* At the first level of review, CDCR partially granted Mr. Anderson's appeal by referring him for further treatment by Dr. Krpan, including a possible custom brace, while denying the request to be classified as a high medical risk and for custom support shoes that were not considered medical equipment and could not be prescribed by medical staff. *Id.* at 3. Mr. Anderson's requests for $30 million and payment of future medical expenses were beyond the scope of the appeals process. *Id.* Mr. Anderson unsuccessfully appealed the partial denial through the second and director's levels of CDCR review on June 3, 2014 and June 23, 2014, respectively, thereby exhausting his administrative remedies. *Id.* at 4-7. On April 7, 2014, a CDCR physician, J. Krpan (not Dr. Krpan), completed a Physician Request for Services (CDCR Form 7243) to request an orthopedic consultation, per the partial grant of Mr. Anderson's administrative appeal. SCC Records at 357.

**vi.        Dr. Krpan's Medical Treatment of Mr. Anderson on June 12, 2014**

As provided by the partial grant of Mr. Anderson's administrative appeal, Dr. Krpan examined Mr. Anderson for a third and final time on June 12, 2014. Krpan Decl. ¶ 6; SCC Records at 355. Mr. Anderson complained of "pain and episodes of crepitus [a grating sound] and popping." Krpan Decl. ¶ 6(a); SCC Records at 355. Dr. Krpan noted again that Mr. Anderson had undergone a modified Evans procedure in February 2012 "after sustaining hundreds of ankle sprains." *Id.* Mr. Anderson reported that his ankle was "considerably improved but he still feels better if he is in some type of ankle support or brace." *Id.* The lace-up brace did not provide "a whole lot of support" and caused numbness in his foot if laced too tightly. *Id.* Dr. Krpan conducted a physical examination of Mr. Anderson's ankle, noting:

> He has a full range of motion of the ankle. He has varus and valgus stress and internal external rotation stress of the ankle that is completely stable and nontender. Dorsalis pedis and posterior tibial pulses are both bonding. Good senatino, normal capillary refill and he really seems to walk with a nonantalgic gait but he is carrying a cane. He had a negative anterior drawer as well.

SCC Records at 355; *accord* Krpan Decl. ¶ 6(b).

Dr. Krpan noted that prior x-rays "showed developing posttraumatic arthritis." SCC Records at 355; *accord* Krpan Decl. ¶ 6. Dr. Krpan assessed that Mr. Anderson "seems to functionally be well but complaining of what appears to be some posttraumatic arthritis." SCC Records at 355. Dr. Krpan's plan of treatment was to "repeat [the] ankle brace," but to try to find a larger size that fit better. Krpan Decl. ¶ 6(d); SCC Records at 355; *see also* SCC Records at 155 (Specialty Clinic Note by specialty assistant C. Jones, RN to "find ankle brace catalog for Dr. Krpan to find a brace large enough"). Following the June 12, 2014 examination, Dr. Krpan completed and signed a CDCR Form 7243 recommending that Mr. Anderson receive a "custom ankle brace" and a follow-up examination as needed. Krpan Decl. ¶ 6; SCC Records at 354. On July 3, 2014, Dr. Forster ordered for Mr. Anderson a "right ankle brace lg shoe size 13." SCC Records at 27. On August 7, 2014, Mr. Anderson received a BREG ankle brace and instructions on fit with an instruction book, and a nurse told him to submit a Health Care Services Request Form (form #7362) if he had any problems. SCC Records at 153. On August 18, 2014, Mr. Anderson completed a Health Care Services Request Form (form #7362) that stated, "I received a ankle brace on 7-3-14[.] After working with the brace I believe this brace is still too small and it gives me some complications. If possible I would like to see my doctor 'Mr. Forster.'" SCC Records at 150.

Dr. Forster examined Mr. Anderson on September 2, 2014 and documented that Mr. Anderson received "R ankle brace from ortho, too large, doesn't fit right. Per I/P the orthopedist told if it doesn't fit he will need to get a custom brace 'in Sacramento.' Not sure if that means UCD or ?" SCC Records at 149. During the September 2, 2014 examination, Dr. Forster noted

that he would "speak [with] the orthopedist about this." SCC Records at 149.

On September 4, 2014, Mr. Anderson filed the complaint in this action against Drs. Krpan and Forster. ECF No. 1. After filing his complaint, Mr. Anderson continued to receive treatment for his ankle from Dr. Forster, but he was not referred to Dr. Krpan again. On January 16, 2015, Mr. Anderson received an AFO "Arizona style" brace. SCC at 350-52. On February 5, 2015, Dr. Forster examined Mr. Anderson and documented:

> f/u orthotic – rec'd AFO brace 1/16/15. Says it is perfect. Finally! We (and orthopedist) had tried several different modalities for his chronic unstable R ankle issues. So it appears the AFO has finally helped. Brace on, fits well. Chronic R ankle pain + laity, prior surgeries. Doing well with an AFO brace.

SCC Records at 143.

After receiving his AFO brace, Mr. Anderson continued to be prescribed morphine for pain. *See* SCC Records at 136-39. During the summer of 2016, Dr. Forster decreased Mr. Anderson's morphine prescription at Mr. Anderson's request. SCC Records at 130-31. At a July 7, 2016 examination, Dr. Forster documented that he referred Mr. Anderson to physical therapy "to help him [with] strengthening his R ankle. He is jogging, playing some basketball, wearing his AFO brace." SCC Records at 130, 336-43.

Later in July 2016, Mr. Anderson transferred from SCC to Calipatria State Prison ("Cal"), where he stopped physical therapy, because "Pt. reports he does not need PT at this time . . . . He reports his ankle is 80% better. He is back to playing sports." SCC Records at 332-33, 337. Mr. Anderson's return to sports went against the advice of Dr. Krpan. Krpan Decl. ¶ 4(d); SCC Records at 365, 369. The next medical record for Mr. Anderson reveals that he was admitted on July 29, 2016 to the CAL infirmary for observation of his ankle and was released on August 5, 2016 at which time he could walk without difficulty. SCC Records at 119-25, 127-29. The final medical records for Mr. Anderson produced in this action by CDCR reveal that he received orthopedic shoes on February 7, 2017. Sanford Decl. ¶ 6, Ex. E ("CAL Records").

## IV. DISCUSSION

We first consider whether defendant, the moving party, has met his initial burden of

"proving the absence of a genuine issue of material fact" and a prima facie entitlement to summary judgment. *Celotex Corp.*, 477 U.S at 323. Defendant presents evidence that plaintiff had three medical appointments with plaintiff concerning plaintiff's ankle injury. Though these appointments are discussed at length above, the court will briefly call attention to their key facts.

The first appointment occurred on February 14, 2013 as a result of Dr. Forster, plaintiff's primary-care physician, referring plaintiff to Dr. Krpan, an orthopedic physician and surgeon. Krpan Decl. ¶ 4; SSC Records at 368-69; Anderson Decl. ¶¶ 36-40. At this appointment, plaintiff complained that after his ankle surgery, "he has never gotten the ankle support [that was ordered by a Dr. David Smith] and still has some mild pain and was wondering if there is anything that can be done." Krpan Decl. ¶ 4(a); SSC Records at 368; Anderson Decl. ¶¶ 36-40. Dr. Krpan examined plaintiff and reviewed an x-ray taken that day. Krpan Decl. ¶ 4(c); SSC Records at 368. The x-rays showed some "bony ossicles." Krpan Decl. ¶ 4(c); SSC Records at 368. However, Dr. Krpan assessed that surgery to remove the ossicles, or bone fragments, was not indicated because plaintiff had a full range of motion and the risks of a second surgery outweighed any possible benefit. Krpan Decl. ¶ 4(c). According to Dr. Giza, an expert witness for defendant, Dr. Krpan's professional assessment that a second surgery to address the common phenomenon of small bone fragments was not warranted is within the standard of care. Giza Decl. ¶¶ 8, 13, 21. Instead of surgery, Dr. Krpan recommended an ankle brace, that plaintiff exercise care with regard to playing basketball, and that plaintiff follow up as needed. Krpan Decl. ¶ 4(d); SCC at 178, 369.

The second appointment, again requested by Dr. Forster, was a follow-up with Dr. Krpan on May 9, 2013. SCC Records at 39, 173. At this appointment, Mr. Anderson reported that "he really has not had any episodes of instability," but that the Aircast brace "did not fit well and did not help," so "[h]e was hoping to try a different type of ankle brace." Krpan Decl. ¶ 5(a); SCC Records at 365. Dr. Krpan examined plaintiff and prescribed "a lace-up ankle support" brace with a follow-up examination as needed. Krpan Decl. ¶ 5(d); SCC Records at 365. Dr. Krpan noted that if the lace-up device did not work, they could try "some type of custom device." Krpan Decl. ¶ 5(d); SCC Records at 365.

19

The third and final appointment was scheduled in response to plaintiff's filing of an administrative appeal with CDCR on March 3, 2014, complaining that he was "under care of M. Forster, MD for broken ankle since 11-2-12, continue to receive inadequate care, ankle brace does not fit, ankle continues to turn.  Require custom fit brace, request orthopedic exam, custom support shoes."  Sanford Decl. ¶ 5 Ex. D ("CDCR Administrative Records").  CDCR partially granted Mr. Anderson's appeal by referring him for further treatment by Dr. Krpan.  *Id.* at 3.  Dr. Krpan examined Mr. Anderson on June 12, 2014.  Krpan Decl. ¶ 6; SCC Records at 355.  Mr. Anderson reported that his ankle was "considerably improved but he still feels better if he is in some type of ankle support or brace."  *Id.*  The lace-up brace did not provide "a whole lot of support" and caused numbness in his foot if laced too tightly.  *Id.*  After physically examining plaintiff and reviewing his x-rays, Dr. Krpan assessed that Mr. Anderson "seems to functionally be well but complaining of what appears to be some posttraumatic arthritis."  Krpan Decl. ¶ 6; *accord* SCC Records at 355.  Dr. Krpan completed and signed a CDCR Form 7243 recommending that Mr. Anderson receive a "custom ankle brace" and a follow-up examination as needed.  Krpan Decl. ¶ 6; SCC Records at 354.

Considering these three interactions, the court finds that defendant's evidence "negat[es] an essential element of the nonmoving party's claim."  *Nissan Fire & Marine Ins. Co., Ltd.*, 210 F.3d at 1102.  Specifically, defendant's evidence negates the second prong of the deliberate indifference inquiry, which is "satisfied by showing (a) a purposeful act or failure to respond to a prisoner's pain or possible medical need and (b) harm caused by the indifference," *Jett*, 439 F.3d at 1096, because defendant affirmatively responded to plaintiff's medical need.  Therefore, defendant has met his initial burden.

Because defendant satisfied his initial burden, the burden shifts to plaintiff to present specific facts that show there to be a genuine issue of a material fact.  *See* Fed R. Civ. P. 56(e); *Matsushita*, 475 U.S. at 586.  While plaintiff makes several arguments why summary judgment should be denied, the court will focus on the second prong of the deliberate indifference inquiry because, if plaintiff fails to establish this essential element, all other issues are moot.

First, plaintiff argues that defendant's deliberate indifference is shown by his failure "to effectuate Dr. David Smith's Order for an AFO brace for over a year." ECF No. 63 at 4. As described above, Dr. David Smith is an orthopedic surgeon who examined plaintiff's post-surgery ankle on October 19, 2012, while plaintiff was still incarcerated at CSP. SCC Records at 374; Anderson Decl. ¶ 73. Dr. Smith recommended an ankle-foot orthosis ("AFO"), which is brace worn on the lower leg and foot to support the ankle. SCC Records at 374; Anderson Decl. ¶ 73. CDCR transferred plaintiff to SCC from CSP in late 2012, FAC ¶ 21; Anderson Decl. ¶ 29, and he had not received the AFO before his transfer to SCC. SCC Records at 183-84. Dr. Forster explored whether plaintiff could transfer back to CSP to be examined by Dr. Smith and fitted for the AFO brace. SCC Records at 182. When plaintiff was not transferred, Dr. Forster referred plaintiff to an orthopedist available at SCC—Dr. Krpan—"to determine the need for an AFO brace or not." SCC Records at 43-44, 179. Over the course of three appointments, Dr. Krpan recommended a series of braces other than an AFO. *See* SCC Records at 365 ("I did discuss with him that a custom AFO is going to be quite constricting, and I do not think at his age, or what he is trying to do with his activity level, is going to be helpful to him, but we will see if this lace-up one works."). However, none of these non-AFO braces fit well. On January 16, 2015, Dr. Forster procured an AFO brace—what Dr. Smith originally recommended—for plaintiff, who said "it is perfect." SCC at 350-52.

These facts may show that defendant recommended ankle braces that plaintiff found to be unsuitable, but they cannot show deliberate indifference. Defendant affirmatively responded to plaintiff's medical need, thereby negating an essential element of his claim. The fact that defendant did not recommend an AFO brace for over a year does not establish deliberate indifference; it demonstrates a difference of opinion. *See Toguchi*, 391 F.3d at 1058.

Perhaps anticipating this conclusion, plaintiff argues that "when a prisoner's treating physicians [recommend] a course of action, and officials (even higher level medical administrators) [ignore] that recommendation, the result is not a mere disagreement over medical treatment but[] can be deliberate indifference." ECF No. 63 at 4 (citing *Johnson v. Wright*, 412 F.3d 398, 406 (2d Cir. 2005)). While plaintiff's legal proposition may be true, it does not

accurately characterize what happened here. Dr. Krpan was not a CDCR "official" or a "higher

level medical administrator" who vetoed plaintiff's treating physician, ECF No. 63 at 4; he *was*

plaintiff's treating physician—just like Dr. Smith had been. Accordingly, this is a textbook

example of "a mere disagreement over medical treatment," *id.*, and a difference of opinion

between medical professionals on appropriate medical diagnosis and treatment is not enough to

establish a deliberate indifference claim. *See Toguchi*, 391 F.3d at 1058. While plaintiff may be

dissatisfied with Dr. Krpan's recommended braces—understandably so with the benefit of

hindsight—Dr. Krpan's failure to recommend an AFO brace from the outset does not establish

deliberate indifference.

Next, plaintiff argues that Dr. Krpan ignored his ankle pain, which amounts to deliberate

indifference. ECF No. 63 at 5. This argument is based on two factual assertions: (1) "plaintiff

had [an] injured ankle that was swollen and in pain for years and an [identifiable] cause floating

bone [particles] that defendant did not have removed and had personal [knowledge] of"; and (2)

"defendant Krpan did nothing to determine the cause of [plaintiff's] pain or to directly render

treatment to correct any existing serious medical need." *Id.*

Both of these allegations are belied by the factual record. Dr. Krpan noted the bone

fragments in plaintiff's ankle, but determined that surgery to remove them was not indicated

because plaintiff had a full range of motion and the risks of a second surgery outweighed any

possible benefits. Krpan Decl. ¶ 4(c). The record also reflects that Dr. Krpan made efforts to

determine the cause of the pain and render treatment. Krpan Decl. ¶ 6 ("I reviewed Mr.

Anderson's prior x-rays which showed developing posttraumatic arthritis.").

Finally, plaintiff cites cases for the proposition that "a course of treatment that is

ineffective may itself constitute deliberate indifference." ECF No. 63 at 5 (citing, *e.g.*, *Greeno v.*

*Daley*, 414 F.3d 645, 655 (7th Cir. 2005)). In *Greeno v. Daly*, a state prisoner brought a

deliberate indifference claim "premised on the prison employees' failure to adequately respond to

his vomiting and severe heartburn, symptoms that appeared in late 1994 and became

progressively worse until he was treated in 1997 for an esophageal ulcer." 414 F.3d 645, 648 (7th

Cir. 2005). In that case, despite the plaintiff's years of requests for effective treatment, prison

staff refused to refer him to a specialist or prescribe anything other than antacids. *Id.* at 648-51.

The instant case is unlike *Greeno*. Not only was plaintiff referred to a specialist—Dr. Krpan—he received a different ankle brace after each appointment. Further, it cannot be said that the course of treatment prescribed by Dr. Krpan was wholly ineffective. Though certain of the braces plaintiff received were more effective than others, Dr. Forster documented that "the lace-up brace . . . has helped [plaintiff] a lot." SCC Records at 170. Accordingly, the course of treatment received by plaintiff was not sufficiently ineffective to support a claim of deliberate indifference.

In sum, the evidence, construed in favor of plaintiff, is insufficient to raise a triable issue whether defendant perpetrated "a purposeful act or failure to respond to a prisoner's pain or possible medical need" as is required to show deliberate indifference. *Jett*, 439 F.3d at 1096. We conclude that there is no genuine issue of material fact and that defendant is entitled to summary judgment.[3]

## V.  NOTICE OF SUMMARY JUDGMENT CONSIDERSATION FOR CLAIM AGAINST DEFENDANT FORSTER

Federal Rule of Civil Procedure 56(f) provides that after giving notice and a reasonable time to respond, the court may "consider summary judgment on its own after identifying for the parties material facts that may not be genuinely in dispute." Fed. R. Civ. P. 56(f)(3); *Celotex*, 477 U.S. at 326 (noting district court's power to enter summary judgment *sua sponte*). The court has reviewed all the evidence submitted in this case. Now, under Rule 56(f), the court gives notice that it is considering entering summary judgment for defendant on plaintiff's claim against defendant Forster on the same ground in the case of defendant Krpan: there is insufficient evidence to prove the claim. Specifically, the court sees no evidence "showing (a) a purposeful act or failure to respond to a prisoner's pain or possible medical need and (b) harm caused by the indifference," *Jett*, 439 F.3d at 1096. The material facts that may not be genuinely disputed, outlined at length in the facts section, are, in essence, that defendant Forster affirmatively treated

---

[3] The court has found that summary judgment is appropriate on the merits. Therefore, we need not address the issue of qualified immunity.

plaintiff's medical need.

Plaintiff may file additional briefing, not to exceed fifteen pages, to address this issue no later than twenty-one days after the entry of this order. Defendant Forster may file a response, not to exceed fifteen pages, no later than seven days after plaintiff's filing. Thereafter, the court will take the matter under submission.

## VI.    FINDINGS AND RECOMMENDATION

Accordingly, we recommend that:

1. that defendant's motion for summary judgment, ECF No. 58, be granted;

2. defendant Krpan be dismissed from this case; and

3. the clerk of the court be directed to reflect the dismissal of defendant Krpan on the court's docket.

We submit these findings and recommendations to the district judge presiding over this case under 28 U.S.C. § 636(b)(1)(B) and Rule 304 of the Local Rules of Practice for the United States District Court, Eastern District of California. Within 14 days of the service of the findings and recommendations, plaintiff may file written objections to the findings and recommendations with the court and serve a copy on all parties. That document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." The district judge will review the findings and recommendations under 28 U.S.C. § 636(b)(1)(C). Plaintiff's failure to file objections within the specified time may result in the waiver of rights on appeal. *See Wilkerson v. Wheeler*, 772 F.3d 834, 839 (9th Cir. 2014).

IT IS SO ORDERED.

Dated: ___January 25, 2019___          _____
                                 UNITED STATES MAGISTRATE JUDGE

No. 203.